**UNITED STATES of America**

v.

**Alejandro MORALES.**

**CR No. 95–045B.**

United States District Court,
D. Rhode Island.

Jan. 30, 1996.

Stephanie S. Browne, United States Attorney, Providence, RI, for Plaintiff.

John F. Ciciline, Providence, RI, for Defendant.

### MEMORANDUM AND ORDER

FRANCIS J. BOYLE, Senior District Judge.

On April 22, 1995 at approximately 8:50 pm, the North Providence Police Department responded to a call about a possible shooting and abduction at 1776 Bicentennial Way, North Providence, Rhode Island. At that address, the police spoke to a woman who reported that around 8:15 pm she heard what sounded to be a single gun shot and saw two men struggling in the residential parking lot until one man shoved the other in a dark car and drove off.

Upon inspection of the parking lot, situated between buildings P and R of the apartment complex, the policemen found one spent shell casing and a wallet on the ground, containing a Massachusetts Driver's License issued to the defendant, Alejandro Morales.

At approximately 10:30 pm that same evening, the Providence Police Department went to 405 Atwells Avenue, Providence, a local tattoo shop, in response to a call about a man being bound and shot. The man turned out to be the defendant. Apparently, Mr. Morales had struggled into the shop and the owner removed handcuffs and tape binding him. Once the police arrived, Morales told them he had been shot, abducted and taken to an abandoned building located around the corner from the tattoo shop. Police officer Thomas Verdi asked Morales if anyone else was shot with him, and he replied "no". By about 11:15 pm the Providence police found the described building at 26 Ames Street in Providence.

Detective Commander Albert Decristofano of the North Providence Police went to the 1776 Bicentennial scene between 9:37 pm and 10 pm and informed the officers that the Providence Police had found the shooting victim, Mr. Morales. Then at approximately 10:35 pm, Decristofano went to the Rhode Island Hospital (RIH) to interview Morales. The interview was quite short because Morales was in the midst of receiving treatment for his gunshot wound. It was ascertained that Morales occupied apartment R–5 of the complex. Decristofano did not ask the defendant if there were other shooting victims.

After the hospital visit, Decristofano went to the tattoo shop located at 405 Atwells Avenue. At that point, no persons at the shop wanted to cooperate with the investigation. The detective then made a brief survey of the basement scene at 26 Ames Street. After completing his investigations at those sites, at about 10:45 pm, Decristofano instructed the officers at 1776 Bicentennial Way to go into Mr. Morales' apartment, R–5. Detective Decristofano testified that he had "no reason" to believe that another victim was present in the defendant's apartment.

Supposing that there may be additional victims, a Providence police officer entered Mr. Morales' apartment without a warrant, more than two hours after Mr. Morales' was injured and at least an hour and forty minutes after the police were informed of the abduction. Once inside the apartment, the search yielded no bodies, but the police officers allegedly saw glassine envelopes, a scale, sifters, and other drug paraphernalia in plain view on the kitchen table. Based upon the contraband sighted, the police sought a search warrant which was issued for apartment R–5 and executed the following morning. The defendant, Alejandro Morales, was subsequently charged with narcotic and firearm offenses. The defendant filed a Motion to Suppress all items seized at his apartment on April 23, 1995, claiming that the initial warrantless entry into the apartment violated his Fourth Amendment rights. He argues that the evidence gathered on April 23, 1993 were "fruits of the poisonous tree" and thus, should be suppressed. *See Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–19, 9 L.Ed.2d 441 (1962); *See also United States v. Thomas Bartelho,* 71 F.3d 436 (1st Cir.1995).

The Government contends that the warrantless entry was justified because of the immediate need to ascertain whether there were additional victims. In rebuttal, the de-

fendant argues that while a warrantless emergency entry may be permissible, it must be based upon facts which create an objectively reasonable belief that such an intrusion is appropriate. The defendant asserts that there were no facts to support an objectively reasonable belief that an emergency existed. The Court agrees with the defendant.

## I. Discussion

### A. The Emergency Exception

 It is a well-known mantra, searches conducted without a warrant are "per se unreasonable under the Fourth Amendment—subject only to a few established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). The burden lies squarely with the government to show that the search in question falls within one of those exceptional circumstances. *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409 (1970). One such accepted exception is labeled "exigent circumstances", those events which require immediate action by the police because there is no time to procure a warrant. *McDonald, v. United States*, 335 U.S. 451, 451–56, 69 S.Ct. 191, 191–94, 93 L.Ed. 153 (1948); *See also United States v. Wilson*, 36 F.3d 205, 209 (1st Cir.1994) (test for exigency is "whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant").

One type of exigent circumstance may arise when the officers believe that someone inside the premises is in need of immediate aid. *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978). But the Supreme Court cautions that a warrantless search is not "justified by any emergency threatening life or limb." *Id.* at 393, 98 S.Ct. at 2413–14. A search must be limited by "the exigencies which justify its initiation." *Id.* It is not crystal clear as to the degree of certainty police must possess before an emergency entry may be made. One legal commentator notes that to justify an intrusion, officers should "be able to point to specific and articulable facts which taken with rational inferences from those facts reasonably warrant the intrusion." 2 W. La-

Fave, SEARCH & SEIZURE § 6.6(a), at 698 (2d ed. 1987).

The First Circuit has developed a line of cases which finds exigent circumstances when the safety of law enforcement or the public is at stake. *See, e.g., United States v. Lopez*, 989 F.2d 24, 26 (1st Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 201, 126 L.Ed.2d 158 (1993); *United States v. Rengifo*, 858 F.2d 800, 805 (1st Cir.1988), *cert. denied*, 490 U.S. 1023, 109 S.Ct. 1752, 104 L.Ed.2d 189 (1989). The case law illustrates that warrantless intrusions under the paradigm of exigent circumstances will be allowed if based on coherent facts. For example, in *United States v. Irizarry*, arrests, pursuant to warrants based on allegations of drug offenses, were executed in a motel. Immediately following the arrest, an agent searched the hotel room because of concern for the safety of his fellow officers. The court acknowledged that it was late at night, and three different offenders had exited the hotel room after a five to seven minute delay, one of whom had a gun. *United States v. Irizarry*, 673 F.2d 554, 558 (1st Cir.1982).

In light of those facts, it was reasonable for the agent to suspect the presence of another person who could harm agents in the hallway; therefore, the warrantless entry, and eventual seizure of drugs in plain view, was allowed. *Id.* In a similar factual situation, the First Circuit affirmed a warrantless search when in the midst of a drug arrest, officers entered various rooms in an apartment and seized a firearm and cocaine. The police officers had reason to believe that the firearm was nearby and one suspect was still at large; therefore, a search was necessary to prevent any further danger. *United States v. Lopez*, 989 F.2d at 26.

 In contrast, warrantless searches are not allowed when law enforcement cannot articulate concrete reasons underlying their action. *See United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir.1995) (Cyr, J.) (" 'exigent circumstances' inquiry is limited to the objective facts reasonably known to, or discoverable by, the officers at the time of the search"). In *United States v. Veillette*, 778 F.2d 899 (1st Cir.1985), *cert. denied*, 476 U.S.

1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986), the First Circuit refused to find justifiable exigent circumstances to affirm the warrantless search of a shop under surveillance in the course of drug raids. The police already had in custody all those who could warn other co-conspirators of the imminent drug raid, and other precautions had been taken to prevent warnings. Moreover, at the time of the raid the police neither saw, nor heard anything that indicated that the premises were occupied. *United States v. Veillette*, 778 F.2d at 902–903. Because there was no reasonable basis for the police's belief that entry was required, the intrusion did not fall under the exigent exception.

Other circuits have also addressed the exigent circumstance exception as applied when law enforcement personnel or public safety is at risk. In a case denying the admission of evidence found by a park ranger after illegally entering a cabin without direct indication of any danger, the Fourth Circuit stated:

> To invoke this so-called "emergency doctrine," the person making the entry must have an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within.

*United States v. Moss*, 963 F.2d 673, 678 (4th Cir.1992), *citing Wayne v. United States*, 318 F.2d 205, 211–12 (D.C.Cir.1963) (plurality opinion), *cert. denied*, 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963); *See also Root v. Gauper*, 438 F.2d 361, 364 (8th Cir.1971) (holding that "police officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress"); *Sheik–Abdi v. McClellan*, 37 F.3d 1240, 1244 (7th Cir.1994) (finding that "burden falls upon the officer to show the existence of an objectively reasonable belief that his intrusion was made to render assistance"), *cert. denied*, —— U.S. ——, 115 S.Ct. 937, 130 L.Ed.2d 882 (1995).

### B. Application of the Emergency Doctrine

█ The police officer entered the defendant's home to determine if there were any other shooting victims. The question is whether there were facts and inferences which provided the police with the "objectively reasonable belief" that an emergency existed. Detective Decristofano of the North Providence Police answered that question. He stated he had "no reason to believe another victim" was present in Mr. Morales' apartment. The facts substantiate this admission. When police arrived at 1776 Bicentennial Way in response to the call-in, no witness mentioned another possible victim. The information was that only one shot was fired and only one spent shell casing was found in the parking lot area, at least 100 to 200 yards away from the apartment buildings. The defendant's wounds accounted for that one shot. There was no information suggesting that a struggle or violence occurred anywhere other than in the parking lot.

Later, after the defendant escaped and sought help in the tattoo shop, the Providence Police had an opportunity to question him about additional victims. The defendant stated that he had been shot in front of his apartment and that no one else was shot. North Providence Police also had ample time to ask if there were other victims when Decristofano went to see the defendant at the Rhode Island Hospital later in the evening. Yet, no inquiry was made as to whether there were more victims. At about 10:30 pm, the North Providence police officers entered the defendant's apartment, ostensibly looking for victims, more than an hour and forty-five minutes after first arriving on the scene. No other apartments were inspected and no officer searched the laundry room, the last locale of the defendant before the shooting. In short, there was no information even remotely suggesting that there was another victim or where another victim might be.

The Court finds that there was no information upon which the police could either subjectively or objectively reasonably believe that an emergency intrusion was warranted.

### C. The Good Faith Argument

█ The government makes the last ditch argument that should this Court find the warrant lacking in probable cause, the evidence seized may still may be admitted on the basis of the "good faith" exception al-

lowed in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). However, the government's reliance on *Leon* is misplaced because the issue is the warrantless search on the evening of April 2, 1995, not the later search pursuant to a warrant issued the following morning. No warrant could have been issued without the information illicitly obtained in the initial April 22nd entry of the defendant's home. The First Circuit Court of Appeals refuses to recognize a good faith exception to warrantless searches. *United States v. Curzi,* 867 F.2d 36, 44 (1st Cir.1989). Other circuits are in accord. *See also United States v. Winsor,* 846 F.2d 1569, 1579 (9th Cir.1988) (good faith exception applies to searches only in reliance on warrant); *United States v. Morgan,* 743 F.2d 1158, 1165 (6th Cir.1984) (*Leon* not applicable when officers did not have warrant), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985).

As explained by the First Circuit, the good faith exception is employed so that an officer is not unfairly penalized for the error of a magistrate. *Curzi,* 867 F.2d at 44. Should the good-faith exception be extended to apply to warrantless searches, the police will inherit an inordinate amount of discretion that would overwhelm Fourth Amendment protections. The government's efforts to insulate the police's warrantless search with the good-faith exception is futile.

Defendant's Motion to Suppress is granted.

**IT IS SO ORDERED.**